OPINION
Appellant, Felix Brown, Jr., appeals from the judgment of the Trumbull County Court of Common Pleas, convicting him of murder, in violation of R.C. 2903.02, with a firearm specification under R.C. 2941.145 and having weapons while under disability, in violation of R.C. 2923.13.
On February 24, 1995, appellant placed a 911 call reporting that he and his fiancée had been robbed and his fiancée had been shot in the head. Captain Charles Wilson, Patrolman Mike Wilson, and Patrolman George Kanicledis responded to the call and proceeded to apartment 278 in the Cedars of Eastwood complex in Niles, Ohio. When they arrived at the scene, appellant yelled from inside the apartment that he needed help and told the officers to kick in the door. Captain Wilson kicked in the door and found appellant attempting to give mouth-to-mouth resuscitation to Monica Brandon. The officers pulled appellant off Monica and paramedics rushed her to the hospital, where she died shortly thereafter. Appellant told the officers that someone named James had robbed them and that two shots had been fired. After Captain Wilson found a .380 caliber gun and a .380 caliber spent shell casing on the bed, Patrolman Wilson told appellant that he would have to go to the police station because he was a material witness. Patrolman Wilson read the Miranda warnings to appellant in the hallway of his apartment and took him to the Niles Police Department. Detective Dixon also responded to the 911 call and collected the evidence that the other officers had found.
When Patrolmen Wilson and Kanicledis arrived at the police station, they re-read the Miranda warnings to appellant, and Patrolman Wilson told him that he would have to take a paraffin test to determine if he had fired a gun. Appellant responded that the test would be positive because he had fired his gun the day before. After Detective Dixon returned from appellant's apartment, he read appellant his Miranda rights for a third time, notified appellant that he was under arrest, and asked appellant if he wanted to make a statement. Appellant gave a statement recorded by Detective Dixon claiming that Monica had accidentally shot herself during an argument. According to appellant's statement, Monica became jealous because she suspected that appellant was involved with another woman. As she stated, "I love you. I love you and no one else is going to have you," she picked up the gun and appellant grabbed her hand with the gun in it. The gun fired into the air, and when the gun fired a second time, the slide split appellant's right hand and the bullet hit Monica in the head. After appellant gave his statement, he signed a waiver of rights form.
On March 16, 1995, appellant was indicted by the Trumbull County Grand Jury on one count of murder with a firearm specification and one count of having weapons while under disability. On June 16, 1995, appellant filed a motion to suppress evidence, which was denied by the trial court. In September of 1995, appellant was tried before a jury, which returned a verdict of guilty on both counts in the indictment. From this judgment of conviction, appellant assigns the following errors:
 "[1.] The trial court erred in refusing to grant appellant's motion to suppress several statements purportedly made by appellant.
 "[2.] The trial judge erred in refusing to answer the jury's question regarding the apartment in which the second shell casing was found.
 "[3.] The trial judge erred in making inappropriate statements to the jury concerning their initial inability to come to a unanimous verdict.
 "[4.] The trial court committed plain error prejudicial to appellant by allowing Dr. William Cox to testify about a .380 gun, which was beyond his scope of expertise.
 "[5.] The trial court erred in overruling appellant's objection to the admission of prior convictions of the appellant in violation of Ohio Rule of Evidence 609(B).
 "[6.] The appellant's convictions for murder with firearms specification and one count of having weapons under disability, as alleged in Counts I and II of the indictment, were against the manifest weight of the evidence.
 "[7.] The trial court's decision concerning the evidentiary hearing regarding the inaccuracies of the trial transcript of the proceeding was against the manifest weight of the evidence.
 "[8.] The appellant was denied effective assistance of counsel, as guaranteed by the Sixth Amendment to the United States Constitution.
 "[9.] The trial court abused its discretion in responding to the jury question concerning the element of purposely for the crime of murder."
In his first assignment of error, appellant alleges that the trial court erred by refusing to grant his motion to suppress evidence. Appellant contends that statements he made to Captain Wilson, Patrolman Kanicledis, Patrolman Wilson, and Detective Dixon should have been suppressed because the officers' testimony would be "summarizations" of his statements and not "exact narratives." He asserts that no rule of evidence permits a witness to summarize another person's prior statements.
Any out-of-court statement made by appellant may be offered against him at trial as an admission by a party-opponent. Evid.R. 801(D)(2)(a). The rules of evidence do not require that such statements be exact narratives to be admissible. That appellant's statements were not recorded does not preclude the officers from testifying about them. The lack of a recorded statement goes to the weight to be given to the evidence by the jury and does not affect its admissibility. The trial court did not err by refusing to suppress appellant's statements on the basis that the testifying officers could not provide exact narratives of his statements.
Appellant further contends that his statements should have been suppressed because the Miranda warnings he received failed to advise him that he had the right to terminate questioning once it commenced. At appellant's suppression hearing, the State presented evidence that Patrolman Wilson advised appellant of his rights while he was still at his apartment. When Patrolmen Wilson and Kanicledis brought appellant to the police station, they administered the Miranda warnings to him in the booking room. Detective Dixon also advised appellant of his rights before taking his statement. The State introduced a waiver form signed by appellant that indicated that he had been advised of the following constitutional rights:
"1. You have the right to remain silent.
 "2. Anything you say can and will be used against you in the court of law.
 "3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
 "4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one."
"* * * [T]he following procedures to safeguard theFifth Amendment privilege [against self-incrimination] must be observed:
 `Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' State v. Dailey (1990), 53 Ohio St.3d 88, 559 N.E.2d 459, quoting Miranda v. Arizona (1966), 384 U.S. 436.
 "Not only must these warnings be given initially, but the opportunity to exercise these rights must be afforded throughout the questioning. If the accused indicates at any stage of the questioning that he does not wish to be interrogated, or he wishes to consult an attorney, the questioning must stop." Klotter, Criminal Evidence (4 ed. 1980) 343.
Although the warnings that appellant received fully complied with the above requirements, appellant maintains that his warnings were inadequate because the officers failed to inform him that he had the option to change his mind and stop talking to the police at any time. Appellant could have chosen to terminate the interrogation at any time; however, no law exists requiring the police to tell a suspect that he has the option to stop talking to them once he has waived his right to remain silent. See, e.g.,State v. Smith (Mar. 20, 1980), Cuyahoga App. No. 40731, unreported. Because the warnings given to appellant satisfied the requirements of Miranda, the trial court did not err by refusing to suppress appellant's statements. Appellant's first assignment of error has no merit.
In his second assignment of error, appellant alleges that the trial court abused its discretion by refusing to answer the following jury question: "we're noticing discrepancies in evidence of a second casing found in apartment number 238 and not apartment 278. Are we to assume that this is only an error in apartment numbers, or was this found in Felix Brown's dad's [sic] apartment?" In response to the jury's question, the trial court responded:
 "Ladies and gentlemen, the Court and the jury have separate and distinct functions. I do not determine the facts of the case. I'm not permitted to advise you on the facts of the case. You and, you alone, determine what the facts are, so the answer to your question is, you will have to recall among yourselves and make a determination as to the facts contained in that question."
At trial, Ben DiGiovonne, a criminal investigator for the State Public Defender's Office, testified that he found a second spent shell casing in Apartment #278 but the receipt that he received from Detective when he submitted the evidence to the Niles Police Department was marked Apartment #238, the apartment of appellant's father. Appellant contends that because the jury's question regarded a simple clerical error regarding the apartment numbers rather than a question of fact, the trial court could have easily clarified the numbers for the jury. He argues that the trial court's failure to do so was an outrageous abuse of discretion that severely impacted the outcome of his trial.
In State v. Frost (1984), 14 Ohio App.3d 320, 322,471 N.E.2d 171, this court held that "[a]ny question by the jury during its deliberation, as to matters of evidence, if answered by the court, may only be answered by repeating, in some fashion, the evidence or testimony offered during the trial itself [emphasis added]." Under Frost, the trial court could have responded to the jury's question by repeating Ben DiGiovonne's testimony; however, the trial court had no duty to do so. The trial court did not abuse its discretion by refusing to answer the jury's question and telling the jury to rely on its recollection of the evidence presented at the trial. Appellant's second assignment of error has no merit.
In his third assignment of error, appellant alleges that the trial court erred by making inappropriate comments regarding the time and expense of the trial in order to persuade the deadlocked jurors to come to a unanimous verdict. When the jury indicated that it could not agree on the murder charge, the trial court gave the jury the following supplemental charge:
 "Ladies and gentlemen, the completion of this trial is of great importance to the parties and to the Court. Not only has there been considerable expense to bring this matter to trial, but also expenditure of valuable time of the parties, the Court, the attorneys and, of course, your valuable time. I urge you to exert every possible effort to reach an agreement, if you can conscientiously do so. This is a new and difficult assignment for you. The process of discussion and deliberation in the jury room is necessarily slow and requires careful consideration and patience. I request that you return to your jury room and review the opinions of each juror to determine whether you have overlooked any areas of agreement which could lead to a verdict.
 "In a large portion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere consent to the conclusion of other jurors, each question submitted to you should be examined with proper regard and deference to the opinions of other jurors. You should consider desirable that the case be decided.
 "You are selected in the same manner, from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. You should listen to each argument with the disposition to be persuaded. Do not hesitate to re-examine your views and change your position, if you are convinced it is wrong. As there is disagreement, all jurors should re-examine their position, given that a verdict has not been reached. Jurors more in favor of the State should consider whether their position is correct, considering it is not shared by others equally honest who have heard the same evidence with the same desire to arrive at the truth and under the same rules. Likewise, jurors more in favor of the Defendant should ask themselves whether their position is correct."
In State v. Howard (1989), 42 Ohio St.3d 18, 537 N.E.2d 188, the Ohio Supreme Court held that the traditional jury charge set forth in State v. Allen (1896), 164 U.S. 492,17 S.Ct. 154, was unduly coercive and should not be given to juries which have become deadlocked. In place of theAllen charge, the court approved a supplemental charge that emphasized that jurors should reach a verdict when they can conscientiously do so and that all jurors should reconsider their opinions in light of the fact that others do not agree.Id. at paragraph two of the syllabus.
Appellant acknowledges that almost all of the trial court's charge complies with the dictates of Howard; however, he contends that the court's comments about the time and expense of the trial were unduly coercive. He asserts that those remarks had the prejudicial effect of placing the jurors under the assumption that they had to reach a verdict, thereby depriving appellant of the possibility of a hung jury and a mistrial. We do not agree with appellant's contention that the trial court's comments concerning the time and expense of the trial were unduly coercive.
In State v. Huber (June 16, 1989), Montgomery App. No. 11276, unreported, the Second District Court of Appeals noted that the Supreme Court of Ohio did not specifically disapprove language in supplemental charges that raises issues of the cost of trial and retrial. The Huber court held that: "* * * [t]he reference to costs in the charge below was not inherently prejudicial. It simply recited what most jurors would surely know; that trials involve costs. Absent an emphasis that distorts the jury's concerns or the balance of the charge, no error will be found." The trial court's supplemental charge, read in its entirety, shows that the charge was well-balanced and encouraged the jurors to re-examine their positions and reach a verdict if they could conscientiously do so. The trial court's reference to the time and expense of the trial did not prejudice appellant; therefore, his third assignment of error has no merit.
In his fourth assignment of error, appellant alleges that the trial court committed plain error by allowing Dr. Cox, the coroner who conducted the autopsy on Monica Brandon, to testify that appellant had a slide cut on his hand from improperly firing a .380 caliber handgun. Dr. Cox testified that he concluded that Monica Brandon's death was not accidental partly because he learned that appellant had sustained a laceration on his right hand between his thumb and second finger at the time of the shooting. Dr. Cox testified that he believed the wound on appellant's hand indicated that appellant and not Monica Brandon had fired the gun. Dr. Cox gave the following explanation to the jury:
 "* * * [W]hen the .380 is discharged, the slide comes back, it has a small grip to it. If you have reasonable size hands, what you have a tendency to do, is your hand is too far — it's too superior and what occurs is, when the slide comes back, it just cuts you, if you are not careful. That is exactly what it is going to do, and what that indicated to me, is that Mr. Brown's right hand was on the grip of that weapon, not Miss Brandon's."
The State next asked Dr. Cox if he had any personal experience with a slide cut from a .380 caliber handgun. He responded that he owns a Walter PPKS, a .380 caliber gun, which he practices firing on occasion. He testified that the last time he fired his gun, he got a laceration between the web of his thumb and his second finger from the gun's slide because he had his hand too high on the grip.
Appellant contends that Dr. Cox testified beyond the scope of his expertise because he was not qualified as a firearms expert. Because appellant failed to object to Dr. Cox's testimony, this court is precluded from taking notice of any error unless it rises to the level of plain error under Crim.R. 52(B). State v.Underwood (1983), 3 Ohio St.3d 12, 444 N.E.2d 1332. An error does not constitute a plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. State v.Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus.
Evid.R. 702 governs the admission of expert testimony and provides, in part:
 A witness may testify as an expert if all of the following apply:
 The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *
Dr. Cox should have been precluded from testifying on the origins of the cut on appellant's hand. Evid.R. 702(B) requires that an expert be qualified by "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Had the State laid a proper foundation, Dr. Cox, as a pathologist, could have given his opinion regarding the wound on appellant's hand; however, the State did not demonstrate that Dr. Cox had arrived at his opinion after examining appellant's hand or the weapon used in the shooting. We cannot conclude that Dr. Cox's limited experience with his own .380 caliber gun qualified him to testify about whether the cut on appellant's hand came from firing the .380 caliber gun that shot Monica Brandon.
Although Dr. Cox should have been precluded from testifying that the cut on appellant's hand was a slide wound, his testimony did not prejudice appellant because the State presented evidence other than Dr. Cox's testimony to prove that appellant had a slide cut. Patrolman Mike Wilson testified that he saw the gash on appellant's hand and the wound was a slide cut. Using appellant's .380 caliber gun that had been placed into evidence, Patrolman Wilson demonstrated for the jury how an individual could be injured if he fires a .380 caliber gun while improperly holding the grip. Because the State did not need Dr. Cox's testimony to prove that appellant had a slide cut on his hand, the admission of Dr. Cox's testimony was harmless error. Appellant's fourth assignment of error has no merit.
In his fifth assignment of error, appellant alleges that the trial court erred by overruling his objection and permitting the State to impeach his credibility with evidence of three of his prior convictions. Appellant was impeached with evidence of the following felony convictions: (1) breaking and entering on February 10, 1981; (2) receiving stolen property on December 22, 1983; and (3) forgery on June 22, 1983. Appellant contends that because the prejudice of introducing his conviction for forgery outweighed its probative value, the evidence of that conviction should have been ruled inadmissible. Appellant also contends that his prior convictions for receiving stolen property and breaking and entering were inadmissible because they were over ten years old. Evid.R. 609 governs the procedure for impeachment by evidence of conviction of crime. Evid.R. 609(A)(2) provides:
 "notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
Evid.R. 609(B) imposes a limit on the ability of a party to impeach a witness's credibility with his prior convictions and provides, in part:
 "Evidence of a conviction * * * is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement, or the termination of probation, or shock probation, or parole, or shock parole imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. * * *"
Appellant's contention that the evidence of his forgery conviction was inadmissible because its prejudicial effect outweighed its probative value has no merit. Convictions for crimes involving dishonesty or false statement are admissible without consideration of unfair prejudice. Evid.R. 609(A)(3).[1] Because appellant served time in prison for the forgery offense until July 2, 1987, the trial court did not err by allowing the State to introduce the forgery conviction against him. Furthermore, appellant's contention that the trial court erred by permitting the State to impeach him with his receiving stolen property conviction has no merit. Under the time limits set forth in Evid.R. 609(B), appellant's conviction for receiving stolen properly was admissible because less than ten years had elapsed since the date of appellant's release from prison on July 2, 1987.
The trial court erred by permitting the State to introduce evidence of appellant's breaking and entering conviction because appellant's parole from that offense was terminated in 1982, more than ten years before he testified in the instant case. The breaking and entering conviction should not have been admitted because the State did not provide sufficient advance written notice of its intention to use the breaking and entering conviction against appellant, and the trial court did not conclude that the probative value of the conviction substantially outweighed its prejudicial effect.
Even though the trial court erred by allowing the State to cross-examine appellant about his breaking and entering conviction, the admission of that conviction did not prejudice appellant. The State properly introduced evidence that appellant had been convicted of forgery and receiving stolen property, and appellant testified on direct examination that he had been incarcerated in 1993 for drug possession and aggravated drug trafficking and had been incarcerated again in 1994 for drug abuse and aggravated drug trafficking. Furthermore, the trial court gave the jury the following limiting instruction:
 "Testimony was introduced that Felix O. Brown, Jr. was convicted of criminal acts. His testimony may be considered for the purpose of helping you test his credibility, the believability, or weight to be given to his testimony. It cannot be considered for any other purpose."
Because evidence of appellant's extensive criminal past was already before the jury and the jury was instructed that the evidence of appellant's convictions could only be used to test his credibility, the admission of the breaking and entering conviction was harmless error. Appellant's fifth assignment of error has no merit.
In his sixth assignment of error, appellant alleges that the verdict, finding him guilty of murder was against the manifest weight of the evidence. "Weight of the evidence concerns the `inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other * * *." [Emphasis in original]. State v. Thompkins (1997), 78 Ohio St.3d 380,387, 678 N.E.2d 541. Appellant asserts that the proper role of an appellate court assessing a manifest weight of the evidence claim was articulated by the Eighth District Court of Appeals in State v. Wilson (June 9, 1994), Cuyahoga App. Nos. 64442 64443, unreported. In Wilson, the Eighth District held that eight factors should be used to determine whether a verdict is against the manifest weight of the evidence; however, this court has rejected that approach. See State v. Harris (Apr. 10, 1998), Trumbull App. No. 96-T-5512, unreported ("the eight factors * * * are merely guidelines to be considered when weighing the evidence and they do not create a new standard to be applied to manifest weight claims").
The Supreme Court of Ohio has approved the following test to determine whether a jury verdict in a criminal case is against the manifest weight of the evidence:
 "`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" Thompkins, supra, at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
After reviewing the entire record, we do not believe that the verdict is against the manifest weight of the evidence. The State presented a significant amount of credible evidence to prove that appellant murdered Monica Brandon. The officers who investigated the case testified that appellant intentionally misled the police by telling them that a robber shot his fiancée. Appellant changed his story and gave a statement to police that he and Monica were arguing and that she accidentally shot herself during a struggle for the gun. Dr. Cox testified that he did not believe that Monica's death was accidental because he learned that appellant had a slide cut on his hand and Monica, who was right-handed, died as a result of a contact gunshot wound to the left side of her head. Kim Lewis, appellant's cousin, testified that she told appellant on the day of the shooting that she had heard that Monica had been seeing other men and doing drugs while appellant was in prison. Rukiya Pugh, who was working at RBG Music on the afternoon of the shooting, testified that she saw appellant at the record store and heard him say "she pissed me off. I'm mad. I'm going to take her out. I'm going to kill that bitch."
In response, appellant testified that the evening of the shooting he and Monica were arguing because he accused her of using drugs, and he told her that their relationship was over. According to appellant, Monica picked up the gun and threatened to kill him. Appellant gave the following testimony as to how the shooting occurred:
 "I was standing. She was standing. I grabbed her hand over top of the gun and the gun went off. I thought it went into the ceiling. I truly didn't know where the bullet went because I wasn't looking at the gun, I was looking at her and I was trying to get the gun away from her. When the gun went off, we both jerked. When we both jerked, I guess the momentum of me still trying to get the gun away from her, she fall on the bed across her back, I fall on top of her. When I fall on top of her, the gun go off again. I immediately feel like there is something wrong, and I roll off of her, and her eyes is looking straight forward and they buckled, and I see blood coming out the side of her head."
Appellant further contends that evidence of gun powder residue on Monica's right hand supports his story that her hand was on the gun when it fired. Atomic absorption analyses testing for gun powder residue were conducted on Monica and appellant. The record demonstrates that Monica tested positive for gun powder residue on her right hand and appellant tested negative. Donna Rose, a forensic scientist for the Bureau of Criminal Investigation, testified that any object within a two foot range from where a gun is fired could have gunshot residue on it and that the residue is easily washed away. Ms. Rose further testified that it is impossible to conclude whether Monica Brandon fired a gun from the results of an atomic absorption test. Although Ms. Rose testified that she had no indication as to whether appellant had washed his hands, Patrolman Wilson testified that shortly after the police arrived at appellant's apartment, appellant went into the bathroom and washed his hands.
The trier of fact generally decides the weight to be given the evidence and the credibility of the witnesses. State v.DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. In the case sub judice, the jury, as the trier of fact, chose not to believe appellant's version of what transpired the night of the shooting. We cannot conclude that the jury lost its way or created such a manifest miscarriage of justice that appellant's conviction must be reversed and a new trial ordered. Appellant's sixth assignment of error has no merit.
In his seventh assignment of error, appellant alleges that the trial court's decision regarding the alleged inaccuracies in the trial transcript was against the manifest weight of the evidence. Appellant contends that there are numerous discrepancies between the audio tapes of the trial and the trial transcript, and the trial court's failure to correct the discrepancies resulted in his inability to argue certain errors on appeal.
App.R. 9(E) provides the conditions under which a trial court record may be corrected:
 "If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the trial court, either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals."
Upon our limited remand, the trial court held an evidentiary hearing to determine whether the trial transcript needed to be corrected. At the hearing, appellant called the following witnesses: himself, his father, Felix Brown, Sr., and his trial counsel, Attorney James Lewis and Attorney Walter Dragelvich. The State called court reporter, Maribeth Hoolihan. On February 27, 1999, the trial court issued its decision, which indicated that it had reviewed all relevant portions of the trial transcript and the audio tapes of the trial recorded as a backup to the official transcript. The trial court's decision included the following findings of fact and conclusions of law:
 "2. The Court finds the transcript to be true and accurate as to Dr. Cox's testimony on page 274.
 "3. The Court finds the transcript true and accurate as to trial testimony on page 258 lines 10-16.
 "4. The Court finds the transcript true and accurate as to Dr. Cox's testimony as to page 245 lines 8 through 11.
 "5. The Court finds the transcript true and accurate as to the testimony of Captain Wilson as to page 52 lines 4-21.
 "6. The Court finds the transcript true and accurate as to the cross examination of investigator Ben D. Giovonne on page 328 lines 1-23 and page 326 lines 1-15.
 "7. The Court finds the transcript to be true and accurate as to Captain Wilson's testimony on page 56 line 16-22.
 "8. The Court finds the Trial Court's instructions on page 563 lines 3-8 to include the language claimed deleted.
 "9. The Court in review of the transcript testimony and audio tapes finds the transcript reflects all the exchange on the record that was capable of being understood. The testimony of Defendant/Appellant's father as to additional jury comments is insufficient to establish that a change in official record is necessary or appropriate. The Court finds the transcript true and accurate in this regard.
 "10. The Court has directed the Court Reporter of the Trial to transcribe the "off the record" side bar that was recorded on the audio tape. * * *
 "Upon full and final review of the Defendant-Appellant's Motion, this Court finds it to be, in all respects, bordering on frivolous. The Defendant-Appellant's recollections were generally self serving and without any basis in fact. The Defendant-Appellant's requested changes in testimony are confusing at best, and apparently created out of whole cloth. Furthermore the Defendant-Appellant has selectively ignored certain portions of the record, that in fact took place.
 "This Court finds the official transcript of this Court to have been completed in a true, accurate and professional manner."
Although appellant asserts that we can reverse the trial court's decision regarding the accuracy of the trial transcript if we determine that its decision was against the manifest weight of the evidence, manifest weight is not the appropriate standard of review. In State v. Schiebel (1990), 55 Ohio St.3d 71,564 N.E.2d 54, the Supreme Court of Ohio determined that an appellate court's authority to correct the record on appeal is very limited and noted:
 "A court of appeals can authorize correction or supplementation of the trial court's record when the accuracy of proposed changes is undisputed, In re Estate of Reeck
(1986), 21 Ohio St.3d 126, 488 N.E.2d 195, but the court of appeals cannot resolve disputes about the trial court's record in the course of an appeal. Associated Estates Corp. v. Fellows
(1983), 11 Ohio App.3d 112, 463 N.E.2d 417." Id. at 82.
The court held that:
 "Where a trial court receives and evaluates conflicting evidence regarding the state of the record, the decision to correct or supplement the record pursuant to App.R. 9(E) rests upon the court's ability to weigh the evidence. Where it is supported by competent, reliable evidence, such ruling will not be reversed by a reviewing court." Id. at paragraph three of the syllabus.
In the instant case, the trial court reviewed the audio tapes of the trial and listened to the witnesses at the evidentiary hearing. We have no reason to doubt the trial court's assessment of the audio tapes, and the record of the evidentiary hearing supports the trial court's conclusion that appellant's testimony was self-serving. Because the trial court's decision concerning the record was supported by competent, reliable evidence, we will not reverse its decision. Appellant's seventh assignment of error has no merit.
In his eighth assignment of error, appellant alleges that he was denied the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution. Appellant contends that his constitutional rights were violated because: (1) trial counsel failed to impeach several witnesses regarding prior inconsistent statements; (2) trial counsel failed to object to inappropriate expert witness testimony; and (3) trial counsel questioned witnesses in a fashion contrary to the defendant's theory of the case.
In order to establish a claim for ineffective assistance of counsel, appellant must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced his defense. Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. Counsel's performance is not deemed deficient unless he made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Id. at 695.
Appellant asserts that trial counsel's failure to impeach Detective Dixon demonstrates that his counsel was ineffective. Appellant alleges that Detective Dixon's trial testimony differed from the testimony that Patrolman Kanicledis gave at the suppression hearing and differed from his own suppression hearing testimony. At the trial, Detective Dixon testified that he told appellant that he was being charged with murder before appellant gave his statement and that after being informed of the murder charge, appellant asked about his potential sentence. At the suppression hearing, Patrolman Kanicledis testified that Detective Dixon informed appellant that he was under arrest before he took appellant's statement but did not tell appellant that he was being charged with murder. Patrolman Kanicledis further testified at the suppression hearing that after Detective Dixon told appellant that he was under arrest, appellant repeatedly asked how much time he was looking at. According to appellant, Detective Dixon testified at the suppression hearing that he notified appellant that he was under arrest and being charged with murder after appellant had given a written statement to the police. Appellant admits that he asked about how much time he was looking at, but he alleges that he did not know that he was being charged with murder when he asked about his potential sentence.
Reviewing the officers' testimony from the suppression hearing and the trial, it appears that Patrolman Kanicledis's testimony varies from Detective Dixon's with respect to whether appellant knew that he was being charged with murder at the time he asked about his potential sentence; however, Detective Dixon never testified at the suppression hearing that he told appellant he was under arrest after he took appellant's statement. Appellant takes Detective Dixon's suppression hearing testimony out of context to arrive at the conclusion that Detective Dixon testified that he told appellant that he was under arrest after he took appellant's statement. Both Patrolman Kanicledis and Detective Dixon testified at the suppression hearing that appellant knew that he was under arrest before he gave his statement to police.
Appellant also construes another inconsistency in Detective Dixon's testimony. At trial, Detective Dixon testified that appellant made his statement some time between 7:00 p.m. and 7:25 p.m. and that appellant was concerned about Monica's condition while he was making his statement. Appellant alleges he could not have been making his statement after 7:00 p.m. because Monica Brandon was pronounced dead at 6:45 p.m.; therefore, he would not have been concerned about Monica's welfare after 7:00 p.m. because she was already dead.
Appellant's argument that he could not have made his statement between 7 p.m. and 7:25 p.m. ignores the distinct possibility that appellant was not informed that Monica had passed away at 6:45 p.m.; however, an inconsistency not raised by appellant does exist in Detective Dixon's testimony. If appellant knew that he was being charged with murder before he made his statement to police, he would not have been concerned about Monica's life status when he was giving that statement.
Trial counsel's failure to impeach Detective Dixon does not rise to the level of ineffective assistance of counsel. Both Detective Dixon and Patrolman Kanicledis testified that appellant asked how much time he was looking at after he was informed that he was under arrest. We cannot conclude that trial counsel was not acting as the counsel guaranteed by the Sixth Amendment simply because he did not impeach Detective Dixon. Even if counsel's performance could be deemed deficient, counsel's error did not prejudice appellant. Appellant cannot demonstrate that the result of the trial would have been different if trial counsel would have impeached Detective Dixon. That appellant asked about his potential sentence after being placed under arrest is an incriminating statement regardless of whether appellant was aware that he was being charged with murder at the time he made the statement.
Appellant maintains that another example of ineffective assistance of counsel was the failure to raise inconsistencies between the testimony of Captain Wilson and Detective Dixon. Captain Wilson testified that he found a .380 auto spent shell casing on appellant's bed on February 24, 1995. Appellant alleges that Detective Dixon testified that he and not Captain Wilson found the shell casing found on appellant's bed. Appellant points to the following testimony to support his claim:
 ATTORNEY LEWIS: Did you subsequently search the apartment after [the night of the shooting]?
DETECTIVE DIXON: Yes, but it was much later.
 ATTORNEY LEWIS: Much later, okay. When you say much later, is that the time that you went back and found the bullet that we're talking about?
DETECTIVE DIXON: No, I was there one other time before that.
 ATTORNEY LEWIS: Okay. You found the original shell casing, it was laying — I'm sorry, you didn't find it, but it was found right on the bed, was it not? The one shell casing that was found?
DETECTIVE DIXON: That is the one I found.
ATTORNEY LEWIS: What's that?
DETECTIVE DIXON: That's the one that I found.
 ATTORNEY LEWIS: The one found, right. It was laying right on the bed, right?
 DETECTIVE DIXON: No, it was on the bed and it was like the comforter or whatever, the bedspread was folded over. It was right underneath there.
Detective Dixon testified that he found a bullet imbedded in concrete underneath the carpet in a subsequent search of appellant's apartment. Although the cross-examination of Detective Wilson is not a picture of clarity, it appears that Detective Dixon and Attorney Lewis are in agreement that Detective Dixon did not find the shell casing on the bedspread. Attorney Lewis stated, "You found the original shell casing, it was laying — I'm sorry, you didn't find it, but it was found right on the bed, was it not?" Detective Dixon does not object to Attorney Lewis's statement that he did not find the shell casing. Although it is impossible to tell from the transcript, Detective Dixon's statement that "[t]hat is the one that I found" may be in reference to the bullet that he found imbedded in the floor of appellant's apartment. We cannot conclude that Detective Dixon claimed that he and not Captain Wilson found the spent shell casing, as appellant alleges. Counsel was not ineffective because there was no inconsistency between the testimony of Captain Wilson and Detective Dixon.
Appellant also contends that counsel was ineffective because they failed to object to Dr. Cox's testimony regarding the cut on appellant's hand. As previously discussed in appellant's fourth assignment of error, the admission of Dr. Cox's testimony did not prejudice appellant and was harmless error. Appellant has failed to demonstrate that he was denied the effective assistance of counsel; his eighth assignment of error has no merit.
In his ninth assignment of error, appellant alleges that the trial court abused its discretion by refusing to answer the following jury question: "if it was not a purposely committed act, is he not guilty?" Appellant contends that the trial court committed reversible error by rereading a portion of the jury instructions rather than answering "yes" to the jury's question. In response to the jury's question, the trial court stated:
 "There is no way a Judge can answer that question except to give you the charge that I gave you. Purposely: Purpose to cause the death of another is an essential element of the crime of murder. A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that, at the time in question, there was present in the mind of the Defendant a specific intention to cause the death of another."
The trial court continued by redefining the word "purposely."
In State v. Carter (1995), 72 Ohio St.3d 545,651 N.E.2d 965, at paragraph one of the syllabus, the Supreme Court of Ohio held:
 "Where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request."
A reversal of a conviction based upon a trial court's response to a question of law posed by the jury requires a showing that the trial court abused its discretion. Id. at 553. An abuse of discretion is more than a mere error of law; "it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
We cannot conclude that the trial court abused its discretion by responding to the jury's question as it did. In Carter, the Ohio Supreme Court concluded that a trial court did not abuse its discretion by refusing to clarify the definition of "purposely" included in the jury instructions when the jury asked for further explanation of that term. Carter, 72 Ohio St.3d at 553. In the instant case, the trial court attempted to answer the jury's question by instructing the jury that "purpose to cause the death of another is an essential element of the crime of murder." Such a response was reasonable under the circumstances because, without giving a yes or no answer, it explained to the jury that unless it found that the defendant had acted purposely, he could not be found guilty of murder. Because the trial court did not abuse its discretion in its response to the jury's question, appellant's ninth assignment of error has no merit.
For the foregoing reasons, the judgment of Trumbull County Court of Common Pleas is affirmed.
 _____________________ JUDGE ROBERT A. NADER
FORD, P.J., CHRISTLEY, J., concur.
[1] Evid.R. 609(A)(3) provides: "notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance."